IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYDNEY BRADSHAW, : | |
|     Petitioner  : | |
| : | |
| v.  : | No. 2:02-CV-04268-CSG |
| : | |
| HONORABLE JOHN ASHCROFT, : | |
| UNITED STATES ATTORNEY  : | |
| GENERAL,  : | |
|     Respondent  : | |
| : | |

GOVERNMENT'S RESPONSE TO PETITIONER'S
"ADDITIONAL SUPPLEMENTAL BRIEF TO SUPPORT
<u>PETITIONER'S CLAIM TO BE A NATIONAL"</u>

I. <u>BACKGROUND</u>

    This is an alien habeas corpus case. The Court in a memorandum order filed June 3, 2002 (No. 01-CV-05221) summarized the facts of Bradshaw's case and denied his petition for a writ of habeas corpus. Bradshaw filed exceptions to the order, the latest claiming that he is a "national" of the United States and immune from removal. In an order filed September 9 the Court directed the government to respond to Bradshaw's contention that he is a "National."

    For the reasons that follow, the claim should be dismissed.

II. <u>ARGUMENT</u>

Bradshaw's filing says that he acquired the status of a "national" when he filed an intent to naturalize with the INS in 1973, on form N-400. Bradshaw says that this filing was "to keep his employment with the city of New York;" Petitioner's Response To Government's Reply (No. 01-CV-05221 Aug. 21, 2002). Because this filing signaled his "allegiance" to the United States, Bradshaw says that he is now a "national" of the United States; <u>cf.</u> <u>Hughes v. Ashcroft</u>, 255 F.3d 752 (9th Cir. 2001). Apparently Bradshaw does not dispute that the petition was never adjudicated.[1]

In the latest dodge to removal, Bradshaw and other criminal aliens are relying on some unfortunate *dicta* in the Ninth Circuit's decision in <u>Hughes v. Ashcroft</u>, *supra,* to the effect that one cannot become a "national" without filing a petition for naturalization. The language is unfortunate because one cannot acquire the status of a national by any volitional act at all, save being born.

---

[1] It cannot be adjudicated now. An alien convicted of an aggravated felony is ineligible for citizenship, as one lacking "good moral character." 8 U.S.C. § 1101(f)(8). One an alien is placed in removal proceedings, any pending application for naturalization must be denied. 8 U.S.C. § 1429.

In other words, Bradshaw would simply opt out of the Congressional scheme of "aliens," "removal," and "aggravated felons" by unilaterally declaring himself a "national" of the United States.

The Immigration & Nationality Act (INA) defines a "national" of the United States as either a citizen or "a person, though not a citizen of the United States, [who] owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22)(B). Title III, Chapter 1 of the INA delineates who is a citizen or national of the United States at birth, beginning at INA Section 301 (8 U.S.C. § 1401). "Citizens" are a subset of "nationals;" persons who are "citizens" of the United States are also "nationals" of the United States, but not the other way about. Those persons who are nationals but not citizens at birth are described at Section 308, which includes people born in the "outlying possessions" of the United States. See 8 U.S.C. § 1408(a). The "outlying possessions" of the United States are, now, American Samoa and Swain's Island. 8 U.S.C. § 1101(a)(29).[2]

---

[2] American Samoa consists of seven islands in the South Central Pacific, with a population of about 65,000. One of them, Swains Island, is a privately-owned atoll with an area of about 1.25 square miles, at 11º 04'S, 171º 05'W; about 100 people work there on a copra

This classification of people as noncitizen "nationals," limited only to natives of American Samoa and Swain's Island, seems in 2002 one hardly worth making. But it was not always thus. The concept of "nationals" of the United States originated at the Treaty of Paris, by which the Spanish-American war ended on December 10, 1898. Spain ceded the Philippines, "Porto Rico" (as it was then called) and Guam to the United States, and freed Cuba. These first three became unincorporated territories of the United States, and their inhabitants were considered "nationals" of the United States. See Rabang v. Boyd, 353 U.S. 427, 430-31, 77 S.Ct. 985, 987-88, 1 L.Ed.2d 956 (1957). In 1902 Congress passed the Philippines Government Act, which rendered the inhabitants of those islands "nationals" but not citizens of the United Sates. See Valmonte v. INS, 136 F.3d 914, 916 (2nd Cir. 1998). In the 1917 Immigration Act Congress extended citizenship to some inhabitants of Puerto Rico, and in the Nationality Act of 1940 (54 Stat. 1137, 1139) decreed that Puerto Ricans born there after April 11, 1899 were American citizens at birth; see 8 U.S.C. § 1402. The 1940

---

farm, owned by one Jennings. The United States extended sovereignty over it on March 4, 1925.

act also defined the "outlying possessions" of the United States, and defined the United States as the continental United States, Alaska, Hawaii, Puerto Rico and the Virgin islands. See Friend v. Reno, 172 F.3d 638 (9th Cir. 1999).

In 1922 the Supreme Court held that an inhabitant of the Philippines who was a "national" of the United States must nonetheless be "naturalized" as a citizen before he could settle and vote in the United States. Balzac v. Porto Rico, 258 U.S. 298, 308, 42 S.Ct. 343, 347, 66 L.Ed. 627 (1922). Following the proclamation of Philippine independence, on July 4, 1946, the Philippines were no longer "outlying possessions" of the United States and Filipinos were no longer United States "nationals." Olegario v. United States, 629 F.2d 204, 217 n.7 (2nd Cir. 1980); In re Naturalization of 68 Filipino War Veterans, 40 F.Supp. 931 (N.D.Cal. 1975).

From 1899 until 1946 there were literally millions of United States "nationals" in America's "outlying possessions." After Philippine independence in 1946, the Organic Act of Guam in 1950 rendered Guamanians American citizens as well. By the time the INA was passed in the Summer of 1952, the concepts of "national" and "outlying

possessions" were carried over from the 1940 Act but the number of persons to whom these concepts applied was vastly diminished.

The point of this *discursus* is two-fold: first, United States nationals who are not citizens are always persons born or living in the insular possessions of the United States, and second, one becomes a "national" only by birth or by Congressional *fiat* relating to a territory. See Miller v. Albright, 523 U.S. 420, 467 n.2, 118 S.Ct. 1428, 1453, 140 L.Ed.2d 575 (1998)("The only remaining noncitizen nationals today are residents of American Samoa and Swains Island"); Hampton v. Mow Sun Wong, 426 U.S. 88, 90 n.1, 96 S.Ct. 1895, 1899 n.1, 48 L.Ed.2d 495 (1976) (same); Igartua De La Rosa v. United States, 229 F.3d 80, 87 n.12 (1st Cir. 2000)("The only persons currently holding such status are residents of American Samoa and Swains Island"); United States v. Ortiz-Marquez, 29 F.3d 636, 1994 WL 265920, *5 n.4 (9th Cir. Jun. 16, 1994), cert. denied, 513 U.S. 912, 11 S.Ct. 286, 130 L.Ed.2d 202 (1995).  There is no application process to become a national, nor does an alien's subjective intent have anything to do with the matter. Becoming a "national" is not some intermediate step antecedent to

admission to citizenship. Title III of the Immigration & Nationality Act, which prescribes in detail the statutory requisites to becoming an American citizen, mentions "nationals" only in describing who attains that status at birth.

The Hughes court acknowledged that persons become nationals "primarily through birth," citing United States v. Sotelo, 109 F.3d 1446, 1448 (9th Cir. 1997). See Oliver v. U.S. Dept. of Justice, 517 F.2d 426, 428 (2nd Cir. 1975) ("One can satisfy [INA] § 101(a)(22)(B) only at birth...."), cert. denied, 423 U.S. 1056, 96 S.Ct. 789, 46 L.Ed.2d 646 (1976); Rabang v. INS, 35 F.3d 1449 (9th Cir. 1994)("national" refers to noncitizen inhabitants of territories). And, of course, to the extent that Hughes stands for the proposition that an alien who applies for and receives admission to American citizenship also becomes a "national" of the United States, that holding is correct. Conversely, as demonstrated above, if the Hughes decision means that any alien can become a "national" merely by subscribing and filing a naturalization application, that conclusion has no support in the statutes nor the caselaw and is unquestionably wrong.

As set out above, the term "national" is defined in the INA. The Attorney General is charged with administering and interpreting the INA, and his determinations are "controlling." 8 U.S.C. § 1103(a)(1).[3] The Attorney General, through his agents, has repeatedly held that "nationals" are persons born in American Samoa or Swain's Island; <u>Hampton v. Mow Sun Wong</u>, *supra*, ("Apparently the only persons other than citizens who owe permanent allegiance to the United States are noncitizen "nationals"....The Solicitor General has advised us that the Commission construes the phrase as covering only natives of American Samoa")(internal citations omitted); <u>Matter of Tuitasi</u>, 15 I.& N. Dec. 102, 103-04, Int. Dec. 2321, 1974 WL 30009 (BIA 1974)(holding that one does not acquire United

---

[3] The section says in full:
(1) The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular  officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.
 8 U.S.C. § 1103(a)(1)(West 2002).

States nationality merely by asserting an allegiance to the United States and noting that "Congress has established rigorous procedures which govern the acquisition of both lawful permanent resident status and United States citizenship for aliens. Nationality has attributes akin to each of these....We cannot accept the respondent's unstated, but underlying, assumption that Congress would permit an alien to acquire United States nationality merely by asserting an allegiance to the United States.")

The Attorney General's decision as to who is a "national" is entitled to considerable deference; INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). In Aguirre-Aguirre, the Court recognized immigration matters as particularly appropriate for judicial deference because executive "officials exercise especially sensitive political functions that implicate questions of foreign relations." Id. at 425, 119 S.Ct. 1439. See Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001)("Our analysis, of course, is constrained by the great deference we owe to the INS in immigration matters,...")

Judge Schiller of this Court addressed an analogous claim in Shittu v. Elwood, 204 F.Supp.2d 876, 2002

WL 992036, *1 (E.D.Pa. May 14, 2002). Shittu was a Nigerian who started trafficking in heroin shortly after his admission to the United States. During the course of his trafficking, Shittu applied for naturalization, presumably as a preemptive measure. Following his conviction and removal order, Shittu filed a habeas petition asserting that the mere filing of the naturalization petition rendered him a "national" of the United States and immune from deportation. Judge Schiller denied the petition, holding that "the existence of a single objective demonstration of permanent allegiance, such as an application for naturalization, is not conclusive if it is contradicted by other evidence showing the applicant's lack of such allegiance." Shittu, 204 F.Supp.2d at 880-81.

  The government disagrees with Judge Schiller's thoughtful analysis in Shittu, although obviously concurring in the result. First, as argued above, no alien can acquire status as a "national" except by birth in an "outlying possession" of the United States. This is not only because the Attorney General says so, but for a more fundamental reason.

  In 1996 Congress devised a comprehensive scheme to

classify and deport aliens, particularly alien criminals. See 8 U.S.C. § 1228(c)(aggravated felons are "conclusively presumed" to be deportable). The 1996 amendments provided "safety valves" for the convicted long-term permanent resident to avoid expulsion, e.g. 8 U.S.C. § 1229b(a), 8 U.S.C. § 1182(h),[4] but the law by no means was intended to exempt long-term resident criminals from the consequences of their crime. Indeed, in this respect Congress intended to treat the permanent resident criminal even more stringently than an illegal alien. Jankowski- Burczyk v. INS, 291 F.3d 172, 175-76 & n. 2 (2d Cir. 2002) ("[t]he upshot of the 1996 amendment, as interpreted by the BIA and as applied by the INS, is that an LPR [lawful permanent resident] is categorically ineligible for a form of relief that a non-LPR would be eligible to seek, even if the two aliens committed the same aggravated felony and even if the citizenship or immigration status of their family members was identical").

---

[4]  See DeSousa v. Reno, 190 F.3d 175, 185 (3d Cir. 1999)(one of Congress' goals in passing AEDPA was to enhance ability to deport criminal aliens by eliminating waiver); Moore v. Ashcroft, 251 F.3d 919, 925 (11th Cir. 2001)( one of Congress' goals in IIRIRA was to expedite the removal of criminal aliens); Lukowski v. INS, 279 F.3d 644, 647 (8th Cir. 2002)(same).

Moreover, as noted above, an alien convicted of an aggravated felony is *per se* barred from establishing "good moral character," which is a statutory prerequisite for admission to citizenship. See 8 U.S.C. § 1427(a)(3) (requirement for naturalization is that alien be "person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.")

It follows that if the alien is "conclusively presumed" deportable, ineligible for a waiver, and statutorily barred from citizenship, Congress certainly did not intend for that same criminal alien to exempt himself from deportation by the facile expedient of declaring his "allegiance" to the United States, or by filing a naturalization petition which, by law, cannot be approved. To exempt the criminal alien from expulsion just because he filed a petition would put the criminal alien in the same place as the naturalized American. In Bradshaw's case he could have pursued his 1973 application for naturalization, and absent a criminal conviction he would have been admitted to citizenship. (One gets the sense from reading Bradshaw's papers that he filed an "intent" solely to satisfy his

employers, with no intent to follow through.) Naturalization, and only naturalization, would have removed him from the ambit of "alienage" and the prospect of deportation. But Bradshaw did not complete the process, and there is nothing in the INA or the Fourteenth Amendment that conveys the rights of a citizen, including the right to remain, upon an alien who merely applies for citizenship. Cf. Lee v. Ashcroft, - F.Supp.2d -, 2002 WL 1585856, *1 (E.D.N.Y. Jul. 15, 2002)(declaring criminal alien a "national" based on long-term residence and registration for selective service).

III. CONCLUSION

      For the foregoing reasons Bradshaw's claim to "national" status should be denied.

                       Respectfully,

                       PATRICK L. MEEHAN
                       United States Attorney

                       _____
                       JAMES G. SHEEHAN
                       Assistant United States Attorney
                       Chief, Civil Division

                       _____
                       STEPHEN J. BRITT
                       Assistant United States Attorney

## *Certificate of Service*

        I certify hereby that on the 24th Day of September, 2002, I personally served or caused to be served a copy of the attached Government's Response To A Supplemental Motion, addressed to:

>Sydney Bradshaw  A13 914 980
>Berks County Prison
>1287 County Welfare Road
>Leesport, PA                    19533-9397
>
>*petitioner*,

by first class mail service upon petitioner.

_____
STEPHEN J. BRITT
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106-4476
(215) 861-8443
(215) 861-8642   telecopier